IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KREG LINDBERG,                                Case No. 6:14-cv-1511-AA

       Plaintiff,                                OPINION AND ORDER

  vs.

UNITED STATES FOREST SERVICE,

       Defendant.

———————————————————————————

AIKEN, Chief Judge:

    Plaintiff Kreg Lindberg filed suit alleging defendant United
States Forest Service ("Forest Service") violated the National
Environmental Policy Act ("NEPA") and the National Forest
Management Act ("NFMA"). Plaintiff moves under Fed. R. Civ. P. 56
for summary judgment on his NEPA and NFMA claims, seeking an order
to set aside the Welcome Station Trail Connections Project Decision
Notice ("DN") and Finding of No Significant Impact ("FONSI"), and
an injunction prohibiting the Forest Service from taking action on

Page 1 - OPINION AND ORDER

the Project without first conducting an Environmental Impact Statement ("EIS"). In turn, the Forest Service filed a cross-motion for summary judgment on plaintiff's claims. After reviewing the parties' briefs and the administrative record, plaintiff's motion for summary judgment is denied, and the Forest Service's cross-motion for summary judgment is granted.

## BACKGROUND

This dispute involves plaintiff's challenge to the Forest Service's approval of the Welcome Station Trail Connections Project ("Project") located in the Bend-Fort Rock Ranger District of the Deschutes National Forest ("DNF"), approximately one-half mile west of the City of Bend. The Project is located in an area with numerous recreation trails for residents and visitors to the DNF. The purpose of the Project is to provide a "Welcome Station" that will serve as a portal to public lands, a non-motorized paved trail connecting the Welcome Station to the City of Bend, and mountain bike trail connections to existing trail networks.

The Forest Service identified the need for the Project based on the demand for non-motorized transportation pathways between the City of Bend and the DNF; the current option for non-motorists is to bike along the shoulder of the Cascade Lakes Highway. Furthermore, the Cascade Lakes Scenic Byway Corridor Management Plan[1] places high priority on the development of a trailhead with

---

[1] This Plan, developed in 1996 and amended in 2011, was designed to protect and preserve the scenic, natural, and recreational qualities of the Cascade Lakes Scenic Byway for future generations. Based on community input, this Plan

an interpretive center and parking for forest users near the DNF boundary with Bend. AR 14742, 15252.

To accomplish the purpose and need for the Project, the Forest Service proposes to construct a trailhead comprised of a Welcome Station with interpretive information and a gravel parking lot; a paved, ADA-accessible, non-motorized path; and three single-track mountain bike trails on National Forest System lands adjacent to and around the Cascade Lakes Highway.

On January 31, 2013, the Forest Service published the Project on the DNF project webpage. AR 14755. Plaintiff initially supported such a project, asking the Forest Service to prioritize a pathway that would connect the west side of Bend to forest lands, and to create a parking lot in the location designated by this Project. AR 8745-46, 12540.

On February 6, 2013, the Forest Service began soliciting public comments regarding the Project through the NEPA "scoping" process. AR 14755. In his comments, plaintiff advocated for more off-leash dog areas, adding that trail recreation has negligible effects on wildlife. AR 12701-03.

In April 2013, the Project was published in the Deschutes National Forest Schedule of Proposed Actions. The Forest Service published a draft Environmental Assessment ("EA") in November 2013,

---

identified enhancement and development priorities for the corridor. The Plan identified creating hubs for trail connectivity and multi-modal transit opportunities as one way to meet the goal of preserving the Scenic Byway as a major attraction in the Pacific Northwest. AR 14742, 15252.

and a 30-day public comment period was provided from November 23, 2013 to December 23, 2013. Plaintiff submitted comments to the Forest Service, no longer expressing support for the paved path component of the Project and asserting that the core issue was a lack of off-leash dog recreation areas near the Deschutes River. AR 14606, 15186.

In March 2014, the Forest Service issued the final EA for the Project, along with a Draft DN and FONSI. The District Ranger selected Alternative 2 from the EA, which has several components. First, a 0.68 acre trailhead would be constructed featuring a "Welcome Station" with information and interpretive materials, and a gravel parking lot accommodating up to 40 cars with two handicap accessible spaces. The trailhead would be located on the south side of Cascade Lakes Highway and would serve as a connection portal to existing trail networks, while providing a safe place for visitors to park. Second, Trail 1, a 3.4 mile non-motorized, ADA-accessible, paved recreation path, would be constructed parallel to and within 150 feet of the Cascade Lakes Highway. Trail 1 would connect the City of Bend's Haul Road trail to the new Welcome Station trailhead. Third, three mountain bike trails would be developed. Trail 2, a 4.8 mile dirt trail, running parallel to and within 150 feet of Forest Service Road 41, would serve to alleviate congestion on the very popular Deschutes River Trail. Trails 3 and 4, totaling about 7.4 miles, would be located north of the Cascade Lakes Highway and serve to reroute and connect existing trails. Fourth, 1.1 miles of existing trail would be obliterated and rehabilitated.

The Forest Service manages the DNF lands at issue in this lawsuit pursuant to the Deschutes National Forest Land and Resource Management Plan ("Forest Plan") as amended by the Upper Deschutes Wild and Scenic River Comprehensive Management Plan ("UDWSR CMP"). The Forest Service worked with the Oregon Department of Fish and Wildlife ("ODFW") when developing the Forest Plan to determine management objectives for elk and deer habitat in the DNF. Management measures were also developed for recreational use within the Ryan Ranch Key Elk Area ("Ryan Ranch KEA"), which the Project area partially overlaps.

In May 2014, plaintiff filed an objection to the Forest Service's Draft DN and FONSI. The ODFW also filed an objection. The Forest Service held objection resolution meetings with the two objecting parties and formally responded to their objections on July 17, 2014. On July 29, 2014, the Forest Service issued the final DN and FONSI for the Project, deciding to proceed with Alternative 2 as presented in the final EA.

On September 23, 2014, plaintiff filed this lawsuit, challenging the completeness of the EA and the Forest Service's decision to issue a DN and FONSI. Plaintiff contends that the Forest Service failed to take a "hard look" at the Project's cumulative impacts to wildlife, namely elk and deer, and to the Upper Deschutes Wild and Scenic River ("UDWSR") corridor. Plaintiff contends that the cumulative impacts are significant, and therefore require the Forest Service to prepare an EIS. Plaintiff also maintains that the Project violates NFMA because it does not comply

with Forest Plan management requirements for the Ryan Ranch KEA or the UDWSR CMP requirements.

The Forest Service timely answered plaintiff's complaint and lodged the Administrative Record with the Court. Plaintiff moved for summary judgment on February 27, 2015, and the Forest Service also moved for summary judgment on April 27, 2015.

## STANDARD OF REVIEW

A plaintiff seeking to challenge a federal agency's compliance with NEPA must bring their claim under the APA. Under the APA, a court may set aside a final agency action if, after reviewing the administrative record, the agency's action is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Natural Res. Def. Council v. Nat'l Marine Fisheries Serv., 421 F.3d 872, 877 (9th Cir. 2005). A decision is not arbitrary or capricious if the federal agency explained its action by articulating a "rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)(quoting Burlington Truck Lines v. U.S., 371 U.S. 156, 168 (1962)); Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs, 384 F.3d 1163, 1170 (9th Cir. 2004).

The scope of judicial review under the "arbitrary and capricious" standard is narrow and the court is not to substitute its judgment for that of the agency. Motor Vehicle Mfrs., 463 U.S. at 43. However, although the standard of review is deferential, it does not relieve the court from engaging in "a substantial

inquiry[,] . . . a thorough, probing, in-depth review." <u>Native Ecosystems Council v. U.S. Forest Serv.</u>, 418 F.3d 953, 960 (9th Cir. 2005).

**DISCUSSION**

I.   <u>Standing</u>

As a threshold matter, the Forest Service claims that plaintiff lacks standing to bring this suit. To establish standing to bring a NEPA challenge to an agency action, a plaintiff must show injury-in-fact, causation, and redressability. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992). "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." <u>Sierra Club v. U.S. Fish & Wildlife Serv.</u>, 235 F. Supp. 2d 1109, 1122 (D. Or. 2002)(internal quotations and citation omitted). Thus, harm to the environment that "affects the recreational or even the mere esthetic interests of the plaintiff" will suffice to establish a concrete and particularized injury. <u>Summers v. Earth Island Inst.</u>, 555 U.S. 488, 494 (2009)(citing <u>Sierra Club v. Morton</u>, 405 U.S. 727, 734 (1972)).

In addition to meeting the three-part constitutional standing test, a plaintiff must also meet the prudential standing requirement of showing that the injury claimed is within the "zone of interests" meant to be protected by the statute. <u>Sierra Club v. U.S. Fish & Wildlife Serv.</u>, 235 F. Supp. 2d at 1122. At the summary judgment stage, a plaintiff must set forth by affidavit or other

evidence, specific facts to establish standing. Lujan, 504 U.S. at
561.

Plaintiff declares that over the past eight years, he has
visited both the eastern section and western section of the Project
area between twenty and twenty-five times each per year. Lindberg
Decl. ¶¶ 4-5. Additionally, he has spent over one thousand hours in
the Project area as a visitor and volunteer, and expects to
continue visiting the area in the future, as there are no
substitutes in the surrounding area. Lindberg Decl. ¶ 6. Plaintiff
contends that the Project's proposed paved path through the DNF
will drastically increase recreational use in the area, undermining
the area's recreational quality, degrading wildlife habitat, and
causing a negative aesthetic impact. Lindberg Decl. ¶¶ 9, 19. A
plaintiff's repeated recreational use of the area, accompanied by
a credible assertion of desired future use, can demonstrate that
environmental degradation of the area is injurious to the
plaintiff. Sierra Club v. U.S. Fish & Wildlife Serv., 235 F. Supp.
2d at 1122. The Court finds that plaintiff has established injury
in fact.

Once injury in fact is established, the causation and
redressiblity requirements are relaxed. Id. at 1123. Plaintiff has
met the causation element, because his alleged injury is traceable
to the challenged Project proposed by the Forest Service. Plaintiff
also establishes redressibility, because an order from this Court
requiring the Forest Service to prepare an EIS would redress
plaintiff's alleged injury. Finally, plaintiff's injury falls

within the zone of interests that NEPA was designed to protect. Id. at 1122. Plaintiff has established standing to bring this action.

II.   NEPA Claims

Plaintiff brings NEPA challenges against the Forest Service for failing to take a hard look at (1) the cumulative impacts to elk and deer caused by the Project and other projects in the area; (2) the cumulative impacts to the UDWSR corridor; and (3) additional NEPA "significance factors," all of which mandate preparation of an EIS according to plaintiff. Thus, plaintiff maintains that the Forest Service's decision to approve the Project without conducting an EIS violated NEPA's procedural requirements and was arbitrary and capricious under the APA.

NEPA is "a procedural statute that does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." Sierra Club v. Bosworth, 510 F.3d 1016, 1018 (9th Cir. 2007)(citation and internal quotations omitted). Further, NEPA requires all agencies to prepare an EIS for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c).

To determine whether the proposed federal action will be significant and trigger the EIS requirement, the agency first prepares an EA. An EA is a "concise public document" that provides an agency's analysis of the proposed action. 40 C.F.R. § 1508.9(a). The EA "shall include brief discussions of the need for the proposal, of alternatives [to the proposed action], of the

environmental impacts of the proposed action and alternatives, and a listing of the agencies and persons consulted." Id. § 1508.9(b). An EA "need not be extensive." Grand Canyon Trust v. U.S. Bureau of Reclamation, 623 F. Supp. 2d 1015, 1026 (D. Ariz. 2009).

To determine whether a proposed action may have "significant" effects, the Council on Environmental Quality ("CEQ") requires the agency to consider the "context" of the action and the "intensity" of its impacts. 40 C.F.R. § 1508.27. When evaluating "intensity," ten factors are considered. Id. § 1508.27(b)(1)-(10). Here, the primary intensity factor is the effect of cumulatively significant impacts, which are "impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . . Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

If the agency concludes there is no significant impact associated with the proposed action, it may issue a Finding of No Significant Impact "accompanied by a convincing statement of reasons to explain why a project's impacts are insignificant," in lieu of preparing an EIS. Sierra Club v. Bosworth, 510 F.3d at 1018 (citation and internal quotations omitted); See 40 C.F.R. § 1508.13.

The court's role in this process is to determine whether the agency took the requisite "hard look" that NEPA demands, by reviewing whether the EA contains "a reasonably thorough

discussion" of the significant aspects of the probable
environmental consequences of the proposed action. See Nat'l Parks
& Conservation Ass'n v. Bureau of Land Mgmt., 606 F.3d 1058, 1072
(9th Cir. 2010)(citation and internal quotations omitted).

    A.   Cumulative Impacts to Elk and Deer

    Plaintiff contends that the Forest Service failed to take a
"hard look" at the potentially significant cumulative impacts to
elk and deer caused by this Project and other projects and trails
in the same area of the DNF. Plaintiff also asserts that the Forest
Service was required to collect quantitative data on current and
future recreational use levels in the Project area in order to
adequately assess cumulative impacts to elk and deer.

    1.   Impacts from Past and Present Projects

    Plaintiff asserts that the Forest Service's analysis of
cumulative impacts to elk and deer was inadequate because it failed
to consider the impacts of this Project in light of the DNF's
extensive trail network and other recreational enhancement
projects. Plaintiff emphasizes that the Forest Service has approved
numerous trail and recreational enhancement projects in the same
area of the DNF as the Project. As a result, plaintiff contends
that elk habitat within the Ryan Ranch KEA and deer habitat within
designated mule deer winter range ("MA7") has been and will be
compromised due to high trail density within the DNF. Plaintiff
further argues that the Forest Service failed to consider the
cumulative effects of the Project combined with the hundreds of
miles of recreational trails in the area, the Cascade Lakes Welcome

Page 11 - OPINION AND ORDER

Station project, and the Phil's Trailhead Enhancement project.

The Forest Service asserts that it properly assessed the cumulative impacts to elk and deer, including the impacts from past and present projects in the Project area. The Forest Service defined the Project area to span across 20,277 acres of DNF lands, encompassing far more land than that occupied by the Project's trailhead and trails. AR 14783. To evaluate cumulative impacts to elk and deer, the Forest Service expanded the analysis area beyond the Project area to include the entire North Unit Diversion Dam Watershed, because the Forest Plan directs elk and deer analyses at larger scales. AR 14982. The Forest Service also developed a table of past, present, and future actions that overlap with the Project area. AR 14784-88. The table included the Cascade Lakes Highway, the development of summer and winter trail systems, the Cascade Lakes Welcome Station and Parking Lot, the Phil's Trailhead Enhancement project, and other projects. Id. Further, the Forest Service contends that the existing condition of an area reflects the aggregate impact of all prior human actions to that particular area; thus, cumulative impacts to the Project area can be assessed by using the current condition of the Project area as the baseline or the "no action alternative." AR 14784, 14858.

The Court recognizes plaintiff's concern that the Project area overlaps with 31% of the Ryan Ranch Key KEA, which is one of eleven key elk habitat areas in the DNF.[2] AR 14751, 14856. The Project

---

[2] Rocky Mountain elk were chosen as a Management Indicator Species for the DNF due to their socioeconomic importance to the hunting community in central Oregon. The ODFW sets "management

Page 12 - OPINION AND ORDER

proposes 10.8 miles of new trail and obliteration of 1.34 miles of trail within the Ryan Ranch KEA, increasing the overall non-motorized trail density by 18%, from 1.49 mi/mi$^2$ to 1.77 mi/mi$^2$. AR 14822, 14858. However, after review of the record, the Court finds that the Forest Service's conclusion that the Project would cause only slight cumulative impacts to elk and deer is supported by a reasonably thorough discussion in the record, and its decision not to prepare an EIS was not arbitrary and capricious.

In its analysis, the Forest Service discusses and cites to the Terrestrial Wildlife Specialist Report, which determined that elk move across sections of the Project area and "the additive effects of a new trail combined with the paved road and other existing trails may begin to alter elk movement." AR 15023. Nonetheless, the Project's effect on elk movement would be "slight." Id. Furthermore, according to scientific studies cited by the Forest Service, elk avoid roads at approximately 1/4 to 1/2 miles, or 1320 to 2640 feet.[3] AR 14856. Relying on this data, the Forest Service purposefully placed Trail 1 and Trail 2 approximately 150 feet from existing roads in order to reduce impacts to elk habitat and to minimize human contact with elk. AR 14860, 15253. Trail 1 and Trail

---

objectives" for the eleven key elk habitat areas to provide habitat conditions sufficient to sustain 1,500 summer elk and 340 wintering elk. AR 14856.

    [3] Early on in Project development, the Forest Service identified "Potential impacts on Key Elk Habitat Area" as one of two "Key Issues" that would be caused directly or indirectly by implementing the proposed action. Thus, impact to elk habitat was used to develop alternatives to the proposed action, prescribe mitigation measures, and analyze or disclose environmental effects. AR 14758-59.

Page 13 - OPINION AND ORDER

2 are also located in areas partially managed under the Forest Plan for "Intensive Recreation." AR 14771. Likewise, Trails 3 and 4 will be located in areas already experiencing high recreational use, and the Project's Welcome Station trailhead and gravel parking lot will be located in an area fully managed for "Intensive Recreation." Id.

In terms of the Project's impact on elk habitat, the wildlife biologist determined that elk hiding cover will not likely be affected by the Project: "[t]ree removal will not reduce hiding cover as there is none mapped in the Project Area." AR 15023. Moreover, the number of trees slated for removal is not projected to convert thermal cover into an unsuitable condition for elk. AR Id. Additionally, no new open roads will be added; rather, the Forest Service expects to close roads in the Ryan Ranch KEA within the next five years. AR 14748-49, 14860.

The Forest Service also considered the cumulative effects of this Project and the West Bend Vegetation Management Project, which proposes to thin, mow, and burn up to 292 acres of thermal cover in the Ryan Ranch KEA. AR 14860. The Forest Service discussed that the West Bend Project will reduce some elk habitat quality but will also increase forage ability. AR 14759, 14860.

Finally, the Forest Service analyzed trend data for elk; elk population is currently stable to increasing, and is expected to remain stable across the DNF. AR 14858-60, 15021, 15025. Therefore, elk are considered "secure" species within the DNF. AR 14841. Based on the findings articulated above, the Forest Service concluded that Project implementation could contribute a small negative

effect to elk habitat, which is insignificant at the forest scale. AR 14860. The Court finds that the Forest Service provided a convincing statement of reasons to support its conclusion that there would be no significant cumulative impacts to elk.

Besides providing habitat for elk, the Project Area also includes 6,604 acres of mule deer habitat.[4] The Project's cumulative impact analysis indicates that the non-motorized trail density affecting deer in the Project area will increase from 3.21 mi/mi$^2$ to 3.50 mi/mi$^2$, a 9% increase. AR 14862. The Forest Service notes that most of the Project trails are within 150 miles of existing roads and thus will reduce fragmentation of deer habitat. The Project's Welcome Station and parking lot are outside of mule deer range, and any increase in human presence at the Welcome Station is not likely detectable because the existing area already includes parking and substantial recreational use. Id. The Forest Service also considered the cumulative effects of the West Bend Vegetation Management Project on mule deer, which proposes to treat 800 to 1,500 acres of deer thermal cover. AR 14862-63.

The Forest Service also discussed the effect of road closures due to the West Bend Project, which will improve habitat conditions for mule deer by reducing road density and will offset some of the impact from increased non-motorized trail use anticipated with the Project. Overall, the Forest Service found that cumulative impacts to mule deer would result in "a minor increase in habitat

_____

[4] Like elk, mule deer were chosen as a Terrestrial Management Indicator Species due to their socioeconomic importance to the hunting community in central Oregon. AR 14860.

Page 15 - OPINION AND ORDER

disturbance (<1% of the available habitat) and would be insignificant at the forest scale." AR 14863.

The Court finds that the Forest Service took a hard look at past and present cumulative impacts to both elk and deer and provided a reasonably thorough explanation supporting its conclusion that the Project will not result in significant cumulative impacts.

2. Impacts from Potential Future Projects

Plaintiff also argues that the Forest Service's cumulative effects analysis for elk and deer did not consider the potentially significant impacts from at least four other reasonably foreseeable projects located in the Project area or on immediately adjacent lands. The Forest Service contends that many of the projects plaintiff argues should have been included in the cumulative effects analysis are too speculative and will be appropriately vetted under NEPA if they come to fruition. The Court addresses each project below.

a. Sunriver-to-Lava Lands Path

Plaintiff concedes that the Forest Service included the trail milage of the Sunriver-to-Lava Lands paved path (Phase 1) in the Project's EA.[5] Pl.'s Reply at 13; AR 14821. However, citing

---

[5] Plaintiff accurately states that the Forest Service, Bend and Sunriver residents, and other stakeholders have a long range vision to ultimately construct a paved path that stretches from Bend to Sunriver. In 2008, the Deschutes County Committee on Recreation Assets recommended a paved route along Forest Service Road 41 between Bend and Sunriver to enhance cycling and recreation opportunities. AR 8823. In 2010, the Forest Service undertook an initial feasibility study of various path configurations that would connect Bend to Sunriver. Id. Phase 1

Klamath-Siskiyou v. Bureau of Land Mgmt., 387 F.3d 989 (9th Cir. 2004), plaintiff contends that the Forest Service must do more than present total trail milage to meet NEPA requirements; rather, the Forest Service must analyze the increased use that the Sunriver-to-Lava Land path will generate in conjunction with the increased use generated by the Project's trails, in addition to the consequences of disrupting big game migration.

The Forest Service clarifies that the Sunriver-to-Lava Lands path was not included in the cumulative effects table in the EA because it is not located within the 20,277-acre Project area; the Sunriver-to-Lava Lands paved path is located on the opposite side of the Deschutes River, miles away from the Project. AR 14752. Regardless, the Forest Service maintains that it analyzed the effects of the Sunriver-to-Lava Lands path in the elk and deer analysis.

The Court finds that, unlike Klamath-Siskiyou, where defendant did not analyze cumulative effects, here the Forest Service's conclusion that the Project will not cause significant cumulative impacts to elk and deer is reasonably supported in the EA. Further, its determination that the Lava Lands path did not need to be included in the cumulative effects table was not arbitrary or capricious due to the path's location outside of the expanded

_____

is an approved paved path that runs from Sunriver to the Lava Lands Visitor Center. Phase 2 is the paved path proposed in this Project that will run from the Bend-DNF boundary to the new Welcome Station proposed in this Project. The location for Phase 3 has not been identified, but would connect Phase 1 and 2 together by constructing a paved path from Sunriver to this Project's Welcome Station. AR 12553, 14771, 14816.

Project area.[6] Moreover, the Forest Service included "the portion of the Sunriver to Lava Lands Visitor Center paved path that has not been constructed yet" in the total number of non-motorized miles of trail in the Ryan Ranch KEA. The Forest Service's discussion in the EA considered potential displacement of elk due to non-motorized trails and found no significant cumulative impacts. AR 14821, 14858. The Forest Service properly analyzed the Sunriver-to-Lava Lands path.

> b.    Sunriver-to-Welcome Station Path

Next, plaintiff argues that the potential Sunriver-to-Welcome Station paved path (Phase 3) is a "reasonably foreseeable future action" under NEPA and should have been included in the Project's cumulative effects analysis. The Forest Service argues that including this "speculative" path is premature, because the Forest Service has not implemented a time frame or settled on a route for this path. Should such a project go forward in the future, the Forest Service maintains that it will be subject to NEPA analysis.

Plaintiff cites N. Plains as support for requiring the inclusion of the Phase 3 path in this Project's EA. N. Plains Res. Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1079 (9th Cir.

---

[6] In the EA chapter discussing cumulative effects, the Forest Service explains that in general, the analysis area would be the Project area; however, "[i]f the resource being analyzed necessitates extending the analysis area outside the project area for an appropriate analysis, then the extent of the analysis area is documented under each resource area below and in the specialist reports located in the project record." AR 14783. Because the Lava Lands path is located outside the general Project area, it was not listed in the table plaintiff refers to; however, this does not mean that it was not analyzed in the expanded analysis area for elk and deer.

2011). In <u>N. Plains</u>, the court held that the agency acted arbitrarily and capriciously when it approved construction of a three-phase rail line without considering future coal bed methane (CBM) well developments and other mining projects in the project area, which would admittedly cause cumulative impacts, even though the agency had "described a time frame and a reasonably foreseeable development plan for CBM development in areas that overlap with the [] railroad plans." <u>Id.</u> (Surface Transportation Board had a Methane EIS report with actual numbers of wells to be drilled in locations overlapping with the train's rail line). Conversely, here the Forest Service has not identified a time frame or identified a route for the Phase 3 path, nor is it preparing to make a decision regarding the Phase 3 path. Def.'s Resp. 27-28.

Additionally, the Forest Service has not listed the project in its Proposed Actions, the NEPA scoping process has not been initiated, and no funding has been sought or secured for the Phase 3 path. Def.'s Resp. 26-27,30; AR 15093[7]. The Forest Service asserts that a future Sunriver-to-Bend path, which would result if the Phase 3 path were constructed to connect Phase 1 and Phase 2, will not escape meaningful NEPA review should the Phase 3 path be pursued in the future.

The Court finds that the Phase 3 path is not a reasonably foreseeable action requiring analysis in this Project's EA. <u>See</u>

---

[7] In plaintiff's May 8, 2014 objection letter addressed to the DNF Reviewing Officer he writes, in reference to the Phase 3 path: "National Environmental Policy Act (NEPA) analysis has not yet started, nor has funding apparently been secured, but the BFR clearly intends to implement the project." AR 15093.

Jones v. Nat'l Marine Fisheries Serv., 741 F.3d 989, 1000 (9th Cir.
2013)(agency did not fail to analyze the cumulative impacts of the
challenged mining project despite plans to widen the scope of
mining in the future because the future plans were speculative and
not reduced to specific proposals); Envtl. Prot. Info. Ctr. v. U.S.
Forest Serv., 451 F.3d 1005, 1014-15 (9th Cir. 2006)(Forest Service
did not act arbitrarily and capriciously when it excluded from the
challenged project's cumulative effects analysis, a timber sale
that was in the initial planning stages, where specifics of units,
size, and treatment prescription had not yet been identified).

### c.    Haul Road Trail

Plaintiff also contends that the Forest Service should have
included the Bend Park and Recreation District's ("BPRD") proposal
to pave its Haul Road trail in the Project's cumulative effects
analysis. The Haul Road trail extends to the DNF boundary and will
connect to the Project's Trail 1. Plaintiff maintains that the Haul
Road trail should have been included in the cumulative effects
analysis, because it will likely increase recreational use within
the Project area.

The Forest Service maintains that plaintiff is barred from
raising the Haul Road trail claim because plaintiff did not
challenge the omission of the Haul Road trail prior to this case.
For example, in his May 8, 2014 objection letter to the final EA
and draft DN/FONSI, plaintiff identified three recreation projects
that he believed the Forest Service should have analyzed for
potential cumulative effects to wildlife and recreational use

Page 20 - OPINION AND ORDER

capacity; the Haul Road trail was not one of them. AR 15092-93. As a result, the Forest Service contends that, because it never had notice or a chance to address plaintiff's concern during the administrative process, plaintiff is barred from litigating the issue now.

Individuals and groups seeking to object to a Forest Service project must "structure their participation so as to alert the local agency officials making particular land management decisions of their positions and contentions." 36 C.F.R. § 218.14. The Court agrees with the Forest Service that plaintiff has waived his right to object to the Haul Road trail at this stage of review because he did not notify the Forest Service that he believed the Haul Road trail should be included in this Project's EA during the administrative process.[8] Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 764-65 (2004)(respondents forfeited an objection to the EA that was not raised during the notice and comment period)(citing Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 553 (1978)); N. Idaho Cmty. Action Network v. U.S. Dep't of Transp., 545 F.3d 1147, 1157 (9th Cir. 2008).

   d.    Pedestrian Bridge Proposal

Fourth, plaintiff asserts that BPRD's proposal to build a pedestrian footbridge is a reasonably foreseeable action that the Forest Service should have included in this Project's cumulative

_____

   [8] Nonetheless, the Forest Service did account for the cumulative effects of the BPRD's plan to pave the Haul Road trail as a "baseline" environmental condition in the no action alternative and all other alternatives in this Project's EA. AR 14802, 14807.

Page 21 - OPINION AND ORDER

effects analysis. The potential bridge would cross the Deschutes River connecting the Deschutes River Trail to trails in the DNF, but the bridge location has not been selected. AR 15093[9]. The Forest Service contends it was not arbitrary and capricious in declining to include the BPRD's proposal for a pedestrian bridge in its cumulative effects analysis because it is not a reasonably foreseeable future action.

First, the City of Bend has not yet decided if it is going to pursue the bridge project. AR 15217. Second, the State Scenic Waterway Designation prohibits bridges on private lands in the area the BPRD has proposed to locate the bridge, and this prohibition may also apply to federal lands. AR 15216. Third, should the BPRD make it over the "Scenic Waterway Designation" hurdle, the Forest Service maintains that a Forest Plan and CMP amendment would likely be required, and the BPRD would need to apply for a Supplemental Use Permit ("SUP") prompting NEPA analysis.

The Court agrees that the BPRD pedestrian bridge proposal is not a reasonably foreseeable action that must be included in the Project's cumulative effects analysis, given that the Forest Service is not pursuing the bridge or actively preparing to decide on one or more alternative means of accomplishing the bridge

---

[9] Plaintiff's objection letter cites to the BPRD's website for the potential bridge project, which indicates that a specific location for the bridge has not been determined and there is a likelihood that federal environmental processes will be required to proceed. The website reads: " . . . should a new bridge location be selected, determined to be feasible, and pass all the required land use approvals, a construction date could still be 6 to 8 years out."

proposal. See 36 C.F.R. 220.4(a)(1). The bridge project is speculative, and the Forest Service did not violate NEPA by failing to consider it in its EA.

In sum, a court must be "'at its most deferential' when reviewing scientific judgments and technical analyses within the agency's expertise." N. Plains, 668 F.3d at 1075 (quoting Balt. Gas & Elc. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 103 (1983). In other words, this Court is not to substitute its judgment for that of the agency. N. Plains, 668 F.3d at 1075. After review of the comprehensive record in this case, the Court cannot find that "the record plainly demonstrates that [the agency] made a clear error in judgment." Id. (citation and internal quotations omitted). The Forest Service provided a convincing statement of reasons, discussed above, explaining why the combined impacts of the existing and projected trail network will produce no significant cumulative impacts to elk and deer.

### 3.    Quantitative Data on Recreational Use

Plaintiff contends that the Forest Service failed to quantify current recreational use levels and future estimated use levels, which he asserts are necessary to analyze whether use of the Project's trails and other trails in the existing DNF trail network may cumulatively cause significant impacts to elk and deer.

The Forest Service responds that the EA and Terrestrial Wildlife Specialist Report adequately assess cumulative impacts from recreational use in the Project area, combined with the effects of a potential increase in recreational use from

Page 23 - OPINION AND ORDER

implementation of the Project. Early on in the NEPA process, the Forest Service determined that miles of trail within the Ryan Ranch KEA was the best metric to evaluate the potential effects to elk from increased recreational use and used this metric to develop the action alternatives for the Project.

Plaintiff correctly asserts that the Project would increase non-motorized trail density within the Ryan Ranch KEA and therefore likely increase recreational use within the area. The Project area overlaps with 31% of the Ryan Ranch KEA and would cause non-motorized trail density in that 31% section to increase by 18%. AR 14751, 14822, 14858. Notably, the Forest Plan does not specify a maximum or limit to non-motorized trail density in the Ryan Ranch KEA. AR 14759.

Nonetheless, plaintiff argues that the Forest Service is required to include quantified recreational use numbers in its cumulative effects analysis, citing N. Cascades Conservation Council v. U.S. Forest Serv., 98 F. Supp. 2d 1193 (W.D. Wash. 1999). In N. Cascades, the court found that the Forest Service failed to properly consider the negative effects of increased motor vehicle use on wildlife outside of the "narrowly defined" project area. N. Cascades, 98 F. Supp. 2d at 1201. The court noted that the challenged project had not been analyzed in the context of the entire off-road vehicle trail system to which three trail projects, including the challenged project, were tied. Id.

However, here the Forest Service analyzed a Project area that was much broader than the Project's trails in order to capture the

Page 24 - OPINION AND ORDER

impacts of the connecting trail network. The Forest Service also explained that it does not have quantitative data on the number of recreational users in the Project area; thus, miles of non-motorized trail within the Ryan Ranch KEA was selected as the best measurement for evaluating the effects of increased recreation to elk. AR 14726-27, 14821, 15217. The wildlife biologist for the Project noted that it is difficult to quantify the effect of increased human visitation or recreation on elk; non-motorized trail mileage was used as a measurement instead. AR 14824, 14983-84. In his own email to the Forest Service, plaintiff noted that a scientific study found no measurable effect of recreation on mule deer population. AR 10075. Similarly, other Project comments agreed that non-motorized trails have "low to zero impact upon wildlife." AR 12714.

   "The court defers to agency expertise on questions of methodology unless the agency has completely failed to address some factor, consideration of which was essential to a truly informed decision whether or not to prepare an environmental impact statement." N. Cascades, 98 F. Supp. 2d at 1202 (citing Inland Empire Pub. Lands Council v. Schultz, 992 F.2d 977, 981 (9th Cir. 1993)). The Court finds that the Forest Service did not violate NEPA by failing to obtain or project quantitative measurements of current or future recreational use levels within the Project area.

   B.   Cumulative Impacts to UDWSR Corridor

   Plaintiff also contends that the Forest Service failed to take a "hard look" at the cumulatively significant impacts to the

Page 25 - OPINION AND ORDER

quality and capacity of recreational use within the UDWSR corridor caused by the Project and other related projects. Plaintiff believes the numerous recreational projects in the area will bring tens of thousands of new users to the Ryan Ranch KEA and UDWSR corridor. AR 15093. Plaintiff contends that the Forest Service should have analyzed whether the Project's components, which will link to the Deschutes River Trail system, comply with the UDWSR's Management Plan R-1 standard that sets the non-commercial annual use capacity at 44,000. AR 5168.

The Forest Service asserts that it did appropriately analyze the cumulative effects of recreational use, because the 20,277 acre Project area included "miles of the Deschutes River corridor, including the Meadow, Lava Island, Big Eddy, Aspen, Dillon Falls, and Slough recreation sites in the river corridor." Def.'s Resp. at 34; AR 14746. The Forest Service also emphasizes that none of the Project components, including the trailhead, paved path, and mountain bike trails, are located in any riparian areas, AR 14753, 14884; in fact, the closest a Project trail ever comes to the Deschutes River is one-half mile. AR 14929. Importantly, the Forest Service maintains that the UDWSR Management Plan R-1 Standard applies only to site designation and development within the UDWSR corridor, and not to pass-through use of the corridor resulting from developments in other areas of the DNF. AR 14901. Furthermore, the Forest Service contends that R-1 does not mandate recreationist counts within the UDWSR corridor; such monitoring is contingent on funding availability. AR 5206, 5214. The Forest Service maintains

that impacts of increased recreational use were accounted for; even with the "no action alternative," recreational use was determined to increase as Bend's population increases. AR 4793.

This Court finds that the Forest Service adequately assessed the cumulative effects of recreational use within the UDWSR corridor. First and foremost, all of the Project's components, including "[t]rail and trailhead construction [are] located entirely outside of the Upper Deschutes Wild and Scenic River corridor." AR 15263, 14750, 14753-54, 14883. The Court emphasizes that the Project area used for the impact analysis is much broader than the Project's trailhead, paved path, and dirt trail components. AR 14754, 15263. The Forest Service expanded the analysis area in order to "encompass all the trail systems proposed trails could provide connections to. The larger analysis area was established to facilitate recreation and wildlife analysis." AR 14750. Thus, while 1,844 acres of the Project area are located within the UDWSR corridor, none of the Project's components will be located within the UDWSR corridor. AR 14749.

Granted, the Project's new trailhead, ADA-accessible paved path, and mountain bike trails could bring new recreationists to the DNF, who may then use trails within the UDWSR corridor; but the Forest Service analyzed this impact: "The increase in parking capacity and availability of new recreation opportunities may lead to an increase in use and encounters, however, the connectivity among the trail systems and the mileage of trail available would provide a trail system that is able to accommodate existing use and

growth." AR 14815. In fact, the Forest Service and members of the public suggest that the Project's trails will reduce congestion on the heavily used Deschutes River Trail, located in the UDWSR, by creating alternative routes for recreationists. AR 12713-14, 12747, 14808, 14926-27.

In sum, the Forest Service made a rational conclusion that the DNF trail system and Project components will accommodate growth and not cause significant cumulative impacts to the UDWSR corridor. Furthermore, the Court agrees that the R-1's non-commercial annual use capacity limit is intended for development within in the corridor, and does not apply to pass-through visitor use within the corridor as a result from other trails located outside of the UDWSR corridor. The Forest Service was not arbitrary or capricious in reaching its conclusion that the cumulative impacts from increased recreational use are not significant.

C.   Additional NEPA Significance Factors

Plaintiff maintains that three other NEPA "significance" factors, when considered collectively or in combination with the cumulative impacts of the Project, require the preparation of an EIS. First, plaintiff asserts that intensity factor number three, "unique characteristics of the geographic area," 40 C.F.R. § 1508.27(b)(3), is implicated because the Project will increase recreational use within a congressionally designated Wild and Scenic River corridor, the UDWSR, and the ecologically critical Ryan Ranch KEA. The Forest Service asserts that the UDWSR corridor is not implicated because no Project components are located within

Page 28 - OPINION AND ORDER

the corridor, and the Forest Service determined that the Project would relieve congestion on the trails that exist within the UDWSR. The Forest Service further asserts that it analyzed the Project's impact to elk in the Ryan Ranch KEA and concluded that the small negative impact on elk habitat was not significant. For the reasons articulated above, the Court finds that intensity factor three does not mandate preparation of an EIS.

Second, plaintiff alleges that intensity factor number five, "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," id. § 1508.27(b)(5), is implicated because the Forest Service lacks quantified information on current recreational use levels and estimated future use levels, in addition to detailed information on the efficacy of its proposed mitigation efforts. For the reasons articulated above, namely that the Forest Service properly accounted for effects of increased recreational use and the fact that the Project's components are outside of the UDWSR corridor, the Court finds intensity factor number five not present.

Third, plaintiff alleges that intensity factor number ten, "whether the action threatens a violation of Federal, State or local law or requirements imposed for the protection of the environment," id. § 1508.27(b)(10), is implicated because the Project violates NFMA. The Forest Service argues that the Project is consistent with the Forest Plan and therefore does not violate NFMA. For the reasons set forth below, the Court finds no NFMA violation as alleged by plaintiff; therefore, this significance

factor does not weigh in favor of an EIS.

Based on the reasons set forth above, the Court finds that the Forest Service adequately analyzed the Project's cumulative impacts to elk and deer in light of past and present projects also affecting the Project area, and the Forest Service properly addressed the four projects that plaintiff maintains should have been included in this Project's EA. Furthermore, relying on its agency expertise, the Forest Service determined that non-motorized trail milage could be used to analyze the cumulative impacts of non-motorized recreational use to elk and deer, rather than quantitative recreational use data that was non-existent and funding dependent. Finally, no other NEPA significance factors are implicated in this case that would mandate preparation of an EIS. In sum, the Forest Service articulated a rational connection between the facts found and its conclusion that no significant cumulative impacts will occur to elk and deer as a result of this Project, in light of the existing trail network and other projects in the Project area. Therefore, the Court finds that the Forest Service's decision to issue a DN and FONSI in lieu of preparing an EIS was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

III. NFMA Claims

Plaintiff brings NFMA challenges against the Forest Service for: (1) failing to comply with the DNF Forest Plan management standard that instructs the Forest Service not to develop facilities that will encourage public use during the winter; and

(2) failing to comply with the UDWSR Comprehensive Management Plan's provision designating annual capacity limits for recreational use.

The NFMA establishes both procedural and substantive requirements for the management of National Forest System lands. 16 U.S.C. §§ 1600 et seq. Under the NFMA, the Forest Service must develop and maintain a Land and Resource Management Plan consisting of broad, long-term objectives for each Forest System Unit. The management plan contains substantive requirements designed to manage forest resources by balancing the consideration of environmental and economic factors. Native Ecosystems Council v. Weldon, 697 F.3d 1043, 1056 (9th Cir. 2012). The NFMA requires that site-specific projects be consistent with the governing forest plan. Id.; 16 U.S.C. § 1604(i). Alleged violations of the NFMA are reviewed under the "arbitrary and capricious" standard of review, according Forest Service management decisions a high degree of deference. 5 U.S.C. § 706(2)(A).

A.    Forest Plan Requirements

In this case, the DNF lands at issue are managed by the Forest Service pursuant to the Deschutes National Forest Land and Resource Management Plan ("Forest Plan") as amended by the UDWSR Comprehensive Management Plan ("CMP"). When developing the Forest Plan, the Forest Service worked with ODFW to develop management objectives for elk within the DNF. Several measures were also developed for recreation management within the Ryan Ranch KEA.

Plaintiff contends that the Forest Service violated the NFMA

Page 31 - OPINION AND ORDER

by failing to comply with Forest Plan management standard WL-45 for the Ryan Ranch KEA which reads: "Facilities will not be developed nor activities promoted which would encourage public use during the winter." AR 1297. Plaintiff argues that developing the Project facilities, i.e. the trailhead, parking lot, and new trails that will connect to existing trail systems, "encourages" public use during winter simply because they will be available for use.

The Forest Service maintains that Forest Plan measure WL-45 must be balanced with other management measures governing the Ryan Ranch KEA. Other competing measures include: "Public use will be encouraged on travel routes which will minimize conflicts with elk"; and "Public use will not be restricted within the Deschutes Wild and Scenic River during the calving season (May 1 to July 31)". AR 1297. The Forest Service further asserts that it has consciously placed Project trails in locations to minimize impacts to elk and will also take mitigation steps to discourage public use of trails during winter.

Where a forest plan management directive is susceptible to more than one meaning, the Forest Service's interpretation and implementation of its own forest plan is accorded deference unless the interpretation is plainly erroneous. Siskiyou Reg'l Educ. Project v. U.S. Forest Serv., 565 F.3d 545, 555 (9th Cir. 2009); Forest Guardians v. U.S. Forest Serv., 329 F.3d 1089, 1097-99 (9th Cir. 2003)(Forest Service's interpretation of forest plan was neither plainly erroneous nor inconsistent with the regulation and thus was entitled to substantial deference); Native Ecosystems

Page 32 - OPINION AND ORDER

Council v. Weldon, 697 F.3d at 1056; Native Ecosystems Council v. U.S. Forest Serv., 418 F.3d at 960 ("[a]gencies are entitled to deference to their interpretation of their own regulations, including Forest Plans").

Even if the Project indirectly encourages winter use in the Ryan Ranch KEA, Trail 1 and Trail 2 are within 150 feet of Cascade Lakes Highway and Forest Service Road 41, which are year-round, high-use roads leading to and from Mt. Bachelor Ski Resort. Based on data cited in the Terrestrial Wildlife Specialist Report, elk avoid roads at 1/4 to 1/2 miles; thus, elk would not be expected near Trail 1 or 2. Furthermore, the record shows that the Forest Service will undertake mitigation measures, including installing interpretive signs at the Project's Welcome Station trailhead that discourage winter use of trails.[10] Additionally, the Cascade Lakes Welcome Station parking lot, which has routes connecting to Trail 1, will be gated during the winter months. AR 15230. The Forest Service also noted that trails within the Ryan Ranch KEA are not maintained for winter use. AR 14860.

---

[10] Plaintiff maintains that the Forest Service must support the assertion that interpretive signs are effective mitigation measures. The wildlife biologist evaluating the Project recommended installing interpretive materials to increase awareness of big game habitat needs in winter, which will help reduce winter use, and indicated that such winter conservation messages should be placed at the new Welcome Station trailhead. AR 14984, 15023. Plaintiff's challenge is not well taken given that he expressly wrote in his March 3, 2013 scoping comments to the Forest Service: "I request that no interpretive signs, kiosks, or other information be included in this project. Instead, I request that all available funds be allocated to trails and parking, which 'directly enhance the recreation experience of our residents and visitors.'" AR 12701.

Page 33 - OPINION AND ORDER

The Forest Service is tasked with managing the DNF according to the principles of multiple use and sustained yield, which require the balancing of many competing uses for the land. See 16 U.S.C. §§ 528-531; 16 U.S.C. § 1604(e). Furthermore, the Forest Service is entitled deference to its interpretation of "encouraging" winter use, and it intends to take steps to comply with WL-45 in order to avoid disturbance of elk during winter months. The Court finds that the Forest Service did not act arbitrarily or capriciously in a plainly erroneous manner in its interpretation of Forest Plan management standard WL-45.

B.   Capacity Limitations in the UDWSR Corridor

Plaintiff also contends that the Project violates NFMA because it does not comply with the annual non-commercial use capacity standards set forth in the UDWSR CMP. Specifically, plaintiff alleges that the Forest Service has not implemented the monitoring program referenced in the UDWSR CMP to obtain numerical non-commercial use data, and therefore the Forest Service cannot have reasonably determined that the Project will not cause non-commercial use levels to exceed the 44,000 annual use capacity limit in River Segment 4. Additionally, plaintiff maintains that the Forest Service failed to present data supporting the conclusion that the Project's new trails will relieve congestion on the Deschutes River Trail.

As explained above, the Forest Service maintains that the non-commercial annual use capacity standard set forth in the UDWSR CMP is inapplicable to the Project, because the Project will not

designate or develop any sites within the UDWSR corridor. AR 14883-84, 14903. The Forest Service emphasizes that plaintiff's argument rests on his own interpretation that the UDWSR CMP annual use capacity standard applies to developments outside of the UDWSR corridor or to developments that may cause recreationists to flow into the UDWSR corridor.

The Court finds that the Forest Service reasonably interpreted the UDWSR CMP's annual use capacity standard to apply to site designation and development within the UDWSR corridor. AR 5136, 5167-68, 15225. Although the Project area boundary overlaps with some of the UDWSR corridor, none of the Project's actual components are located within the UDWSR. In fact, the Project's trailhead, parking lot, and much of Trail 1 and 2 are located in areas managed for "Intensive Recreation," and Trail 3 and 4 are located even farther away from the UDWSR corridor. AR 14771. Additionally, the Forest Service articulated that the information it evaluated, including letters received during the comment process, support its determination that the Project will likely reduce congestion on the Deschutes River Trail, located within the UDWSR corridor. AR 14808-11, 14926-27, 12713-14, 12747, 12758. The Court finds the Forest Service was not arbitrary or capricious in determining that the non-commercial annual use capacity limit is not invoked by the Project.

## CONCLUSION

For the reasons set forth above, plaintiff's motion for summary judgment (doc. 13) is DENIED, and the Forest Service's

Page 35 - OPINION AND ORDER

cross motion for summary judgment (doc. 16) is GRANTED. This case is dismissed. The parties' request for oral argument is denied as unnecessary.

IT IS SO ORDERED.

Dated this _15th_ day of September, 2015.


_____

Ann Aiken
United States District Judge


Page 36 - OPINION AND ORDER